1

2

3

4

5

6                         UNITED STATES DISTRICT COURT

7                              DISTRICT OF NEVADA

8                                     * * *

9   LYDIA LEE and CAROLYN BISSONETTE,    )
    individually and on behalf of others similarly  )
10  situated,                            )
                                         )
11               Plaintiffs,             )
                                         )           3:10-CV-00326-LRH-WGC
12  v.                                   )
                                         )
13  ENTERPRISE LEASING COMPANY-          )           ORDER
    WEST, LLC, a Delaware LLC; and       )
14  VANGUARD CAR RENTAL USA, LLC, a      )
    Delaware LLC,                        )
15                                       )
                 Defendants.             )
16  _____  )

17          Before the Court is Defendants Enterprise Leasing Company-West, LLC ("Enterprise") and

18  Vanguard Car Rental USA, LLC's ("Vanguard") (collectively "Defendants") Motion for Summary

19  Judgment on Liability.  Doc. #63.[1]  Plaintiffs Lydia Lee ("Lee") and Carolyn Bissonette

20  ("Bissonette") (collectively "Plaintiffs") filed a Response (Doc. #90), to which Defendants replied

21  (Doc. #93).  Defendants also filed a Motion for Summary Judgment on Damages and Restitution.

22  Doc. #64.  Plaintiffs filed a Response (Doc. #88), to which Defendants replied (Doc. #95).

23          Also before the Court is Plaintiffs' Motion for Summary Judgment.  Doc. #73.  Defendants

24  filed a Response (Doc. #81), to which Plaintiffs replied (Doc. #101).

25  ///

26  _____

            [1]  Refers to the Court's docket number.

I.      **Factual Background**

This is a putative class action filed on behalf of persons who rented cars from Enterprise and Vanguard in the State of Nevada.  Although involving different parties, the action involves substantially the same claims and issues that are presented in a separate case currently pending before this Court, *Sobel v. Hertz Corp.*, No. 3:06-cv-545-LRH-RAM.  As in *Sobel*, the dispute in this case centers on whether Nevada Revised Statute ("NRS") 482.31575, prior to amendment on October 1, 2009, allowed Defendants to charge customers a separate airport concession recovery fee that was not included in the base rental rate as advertised and quoted to customers.[2]

The material facts at issue herein are largely undisputed.  In order to operate "on-airport," McCarran International Airport ("McCarran") in Las Vegas, Nevada, and Reno-Tahoe International Airport ("RTI") in Reno, Nevada, require rental car companies, including Defendants, to pay a "concession fee" of ten percent of their gross revenue received there.[3]  Doc. #74, ¶¶6, 11; Doc. #85, ¶¶6, 11.  These fees are set by contractual agreements called "Concession Agreements."  Doc. #65 (Walker Decl.), ¶9; Doc. #66 (Best Decl.), ¶¶11, 16, 17, Ex. A, Ex. B, Ex. C, Ex. D.  Individual lessees are not party to those agreements.  Doc. #74, ¶¶6, 11; Doc. #85, ¶¶6, 11.  Although the airports impose this fee on rental car companies, as opposed to their customers (i.e., the short-term lessees), Defendants pass along the expense to their customers by imposing a ten-percent surcharge

---

[2]  As amended, NRS 482.31575 now expressly permits this practice.

[3]  When NRS 482.31575 went into effect in October 1989, Vanguard, operating as Alamo Rent-a-Car ("Alamo"), was operating as an "off-airport" rental car company from a privately owned location near McCarran.  Doc. #66 (Best Decl.), ¶9.  Enterprise began operating as an off-airport rental car company near McCarran in 1990.  *Id.*  In 2002, Defendants independently went on-airport at McCarran. *Id.*, ¶11.  In January 1998, Alamo began operating on-airport at RTI.  *Id.*, ¶16.  Enterprise began operating on-airport at RTI in May 2002.  *Id.*, ¶17.

To the extent Defendants dispute whether all on-airport car rental companies in Nevada were subject to a minimum annual guarantee (Doc. #85, ¶6), the Court finds resolution of this issue, as well as any dispute regarding the exact percentage of gross revenues constituting the concession fee at various Nevada airport locations, to be immaterial to a determination of the present dispute.

on the base rental rate as a so-called "airport concession recovery fee" ("ACRF").[4]  Doc. #74, ¶¶9, 14; Doc. #85; ¶9, 14.  At all relevant times, Defendants "unbundled" the ACRF from their base rental rates.  Doc. #74, ¶16; Doc. #85, ¶16.  In essence, Defendants advertised and quoted to customers a base rental rate that did not include the separate ACRF that Defendants ultimately charged their customers.  *Id.*

**II.    Legal Standard**

Summary judgment is appropriate only when the pleadings, depositions, answers to interrogatories, affidavits or declarations, stipulations, admissions, and other materials in the record show that "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In assessing a motion for summary judgment, the evidence, together with all inferences that can reasonably be drawn therefrom, must be read in the light most favorable to the party opposing the motion.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cnty. of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1154 (9th Cir. 2001).

The moving party bears the initial burden of informing the court of the basis for its motion, along with evidence showing the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  On those issues for which it bears the burden of proof, the moving party must make a showing that is "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party."  *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986); *see also Idema v. Dreamworks, Inc.*, 162 F. Supp. 2d 1129, 1141 (C.D. Cal. 2001).  On an issue as to which the non-moving party has the burden of proof, however, the moving party

---

[4]  On April 1, 2006, Lee rented a car from Enterprise at McCarran in Las Vegas, Nevada.  Doc. #74, ¶3; Doc. #85, ¶3.  In addition to the base rental rate, Enterprise charged an additional $7.92, which Enterprise described on her rental documents as an "AP/Access 10.000%."  *Id.*  Similarly, on February 24, 2008, Bissonette rented a car from Alamo, at McCarran in Las Vegas, Nevada.  Doc. #74, ¶5; Doc. #85, ¶5.  In addition to the base rental rate, Bissonette was charged a "Concession Recovery Fee @10.000%" in the amount of $40.60.  *Id.*

1  can prevail merely by demonstrating that there is an absence of evidence to support an essential

2  element of the non-moving party's case.  *Celotex*, 477 U.S. at 323.

3        To successfully rebut a motion for summary judgment, the non-moving party must point to

4  facts supported by the record which demonstrate a genuine issue of material fact.  *Reese v.*

5  *Jefferson Sch. Dist. No. 14J*, 208 F.3d 736 (9th Cir. 2000).  A "material fact" is a fact "that might

6  affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

7  242, 248 (1986).  Where reasonable minds could differ on the material facts at issue, summary

8  judgment is not appropriate.  *See v. Durang*, 711 F.2d 141, 143 (9th Cir. 1983).  A dispute

9  regarding a material fact is considered genuine "if the evidence is such that a reasonable jury could

10  return a verdict for the nonmoving party."  *Liberty Lobby*, 477 U.S. at 248.  The mere existence of a

11  scintilla of evidence in support of the party's position is insufficient to establish a genuine dispute;

12  there must be evidence on which a jury could reasonably find for the party.  *See id.* at 252.  Finally,

13  whereas here, both sides have moved for summary judgment, the court must consider evidence

14  submitted in support of both motions before ruling on either motion.  *See Fair Housing Council of*

15  *Riverside Cnty., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001).

16  **III.**    **Discussion**

17      **A.**    **Defendants' Motion for Summary Judgment on Liability**

18          **1.**    **Interpretation of NRS 482.31575**

19        Defendants seek summary judgment on the ground that their business practice of

20  unbundling the ACRFs did not violate NRS 482.31575.  As Defendants are admittedly aware, in

21  *Sobel*, this Court held "as a matter of law" that, prior to its amendment in 2009, "section 482.31575

22  required [on-airport] rental car companies to include the [ACRF] in the base rate that they

23  advertised, quoted, and charged to short-term lessees," such that it was unlawful to charge an

24  unbundled ACRF on top of the advertised and quoted base rental rate.  *Sobel v. Hertz Corp.*, 698 F.

25  Supp. 2d 1218, 1232 (D. Nev. Mar. 17, 2010) (No. 3:06-cv-545-LRH-RAM, Doc. #111) (order on

26  summary judgment) ("*Sobel II*"); *accord Sobel v. Hertz Corp.*, 2007 WL 2710725, *4 (D. Nev.

1  Sept. 13, 2007) (No. 3:06-cv-545-LRH-RAM, Doc. #22) (order on motion to dismiss) ("*Sobel I*").

2  Nevertheless, Defendants urge the Court "to rule on the issue once again, because the record here is

3  different than in *Sobel*." Doc. #63, p. 19.  Specifically, Defendants argue that the Court did not

4  have the benefit of testimony from airport officials regarding the nature and purpose of airport fees

5  or the manner in which the statute was interpreted and applied by Nevada officials for the past 25

6  years. *Id.*; Doc. #93, p. 13.

7       As a preliminary matter, the Court notes its agreement with Plaintiffs as to the precedential

8  effect of the Court's rulings in *Sobel*.  Indeed, "judicial precedent attaches a specific legal

9  consequence to a detailed set of facts in an adjudged case or judicial decision, which is then

10  considered as furnishing the rule for the determination of a subsequent case involving *identical or*

11  *similar material facts* and arising in the *same* court or a lower court in the judicial hierarchy."

12  *United States v. Osborne (In re Osborne)*, 76 F.3d 306, 309 (9th Cir. 1996) (emphasis added).

13  Insofar as *Sobel* announced a decision on a point of law, the Court owes obedience to that decision

14  and, thus, shall not disturb its ruling in that regard.  Moreover, to the extent that the material facts

15  of this case are nearly identical to those of *Sobel*, the Court is not inclined to revisit prior

16  determinations as to the application of NRS 482.31575.  Nevertheless, as Defendants aver, the

17  result in this case is not pre-ordained by *Sobel*.  As such, the Court shall address each of

18  Defendants' arguments as they relate to the unique facts of this case.

19                                    ***Evidentiary Record***

20       First, Defendants contend that the evidentiary record in the present case supports a different

21  interpretation of NRS 482.31575 than was announced in *Sobel*.  Specifically, Defendants argue, the

22  phrase "any fees paid to airports" means any fees that a rental car company collects from customers

23  and pays to the airport.  *See* Doc. #63, pp. 19-20.  The Court disagrees.  In addressing Defendants'

24  argument to this effect in its September 10, 2012 Order, the Court found that:

25       [a] critical part of the [C]ourt's reasoning [in *Sobel*] was that the statute's reference
        to "any fees paid to airports" that a short-term lessee "must pay" refers only to
26       charges that the airports require to be paid by the rental car customer and "over

which the leasing company would have no control." . . . Contrary to Defendants' argument, this unequivocally does *not* include airport concession fees that the car rental companies pass along to their customers at their own option.

Doc. #44, p. 7 (citing *Sobel I*, 2007 WL 2710725, *2-3). As a consequence of the Court's interpretation in this regard, the statute affords different treatment to off-airport rental car fees (i.e., "access fees") than to on-airport rental car fees (i.e., concession fees).[5] While both types of fees are payable to the airport, the former are imposed on short-term lessees,[6] whereas the latter are imposed on rental car companies.

Defendants' attempt to equate the off-airport access fee with the on-airport concession fee is unavailing and unsupported by the evidence. Specifically, Defendants argue that Clark County Ordinance 20.09.010 imposes an access fee on the rental car companies as opposed to their customers. However, a plain reading of the ordinance indicates that off-airport rental car companies have a legal obligation to "collect and pay" the access fee. *See* Doc. #65 (Walker Decl.), Ex. C (Clark County Ordinance 20.09.010(c)(6)(B)) ("[s]uch operators will collect and pay an airport access fee . . . "). As such, the short-term lessee bears the ultimate legal obligation to pay the access fee that is collected by the off-airport rental car company and paid to the airport. In contrast, no such legal obligation to pay the concession fee is born by short-term lessees who rent cars from on-airport rental car companies. Instead, the legal obligation to pay the concession fee rests solely with the on-airport rental car companies. Nothing requires those on-airport rental car companies, including Defendants, to pass that fee along to their customers in the form of an ACRF.

---

[5] Defendants argue that "[t]he fundamental *premise* of [the Court's] interpretation of [NRS] 482.31575 advanced in *Sobel* is that the statute accords different treatment to <u>off-airport</u> rental car fees imposed by Ordinance than to <u>on-airport</u> fees imposed by contract." Doc. #63, p. 20 (emphasis added). However, that the statute affords different treatment to off-airport rental car fees imposed by ordinance than to on-airport fees imposed by contract is not a *basis* on which the Court's reasoning proceeds. Rather, the differential treatment in this regard is a *consequence* of the Court's reasoning.

[6] Specifically, Clark County Ordinance 20.09.010 requires off-airport rental car companies to "collect and pay an airport access fee . . . for each contract written for the vehicle rentals to customers picked up at the [airport] and transported to operator's place of business." Doc. #65, Ex. C.

1   Accordingly, the access fee that short-term lessees who rent cars from off-airport rental car

2   companies must pay to the airport is distinct from the concession fee that on-airport rental car

3   companies must pay to the airport. *See* Doc. #44, p. 7.  The Concession Agreements which

4   governed Defendants' relationship with the airports at the time of Plaintiffs' rentals explicitly

5   recognize this distinction in section 3.5—"none of those payments, [referring to the ACRFs]

6   reflects a fee that is imposed by the County upon customers renting vehicles from Concessionaire."

7   Doc. #66, Ex. A, Ex. B.

8        Defendants go to great lengths to argue that the Court's construction requires a re-writing of

9   the statute such that only those "fees imposed by a local government agency paid directly to

10  airports by the customer and not by the short term-lessor" [sic] are exempt. *See* Doc. #93, pp. 14-

11  15.  Defendants miss the point.  The statute does not distinguish between access fees and

12  concession fees.  Instead, the statute distinguishes between "fees paid to airports" and other fees not

13  paid to airports.  That access fees and concession fees (and, by extension, ACRFs) are treated

14  differently under the statute does not change its mandate.  Nor does it require the Court to engage in

15  "judicial legislation and rewrite the statute," as Defendants suggest.  The simple fact remains: the

16  ACRF is not a fee paid to airports, it is a fee paid to Defendants.  That Defendants opted to pass

17  along the concession fee to their customers does not render the ACRF a "fee paid to airports."  In

18  the Court's view, it is Defendants who are attempting to re-write the statute by insinuating that the

19  exceptions thereunder apply only when a customer pays a fee "directly" to the airport—i.e., without

20  using the rental car company as a conduit. *See* Doc. #81, pp. 8-9.  However, the statute simply does

21  not require that the fee be paid by the customer to the airport in this manner.  As such, the Court

22  concludes that the access fee that off-airport rental car companies charge to their customers on

23  behalf of the airport—as with any other state or county tax—falls within the statute's exceptions.

24        Nevertheless, whether the access fees applicable to off-airport lessees are exempt under the

25  statute is immaterial at this juncture, as Defendants were operating on-airport at all relevant times.

26  Moreover, even if the access fees are not exempt, it does not render the phrase "any fees paid to

airports" nugatory as Defendants suggest.  Indeed, it is certainly conceivable that the Nevada Legislature anticipated a situation in which rental car customers would be subject to a fee payable to the airport rather than the rental car companies themselves.  And because the undisputed purpose of NRS 482.31575 was to protect rental car customers from the *rental car companies'* misleading advertising practices, the only logical inference is that the legislature would have exempted those mandatory fees over which the rental car companies have no control.

The Court is similarly unpersuaded by Defendants' argument that the concession fee charged by the airports is *not* "an ordinary operating expense voluntarily assumed by the rental car company" that is merely "the rental car company's cost of doing business."  In *Sobel*, the Court determined that the concession fee does indeed "represent[] the rental car company's cost of doing business for the advantage of operating on the airport."  *Sobel I*, 2007 WL 2710725, at *2.  In this regard, the Court maintains the reasoning set forth therein:

> What the rental company chooses to contract for with the airport is a contract obligation of the company alone; it does not constitute a fee for which the short-term lessee is responsible.  The amount of the surcharge is arbitrarily determined by the on-airport rental company, and it represents nothing more than a recoupment of an ordinary operating expense voluntarily assumed by the rental company.  Thus, the airport fee surcharge is not an airport fee. Rather, it is a surcharge for an operating expense of the rental company.

*Id.*  That the fee is not "fixed" in a manner analogous to rent—the fee is imposed in proportion to the rental car company's gross operating revenue—does not change its character in this regard. Moreover, Defendants miss the mark when they urge that the concession fee is not voluntarily assumed, as the voluntariness of the concession fee is not at issue.  Rather, the only issue in this regard is whether Defendants' imposition of an ACRF on its customers is voluntary.  As the Court has already determined, it is.  Further, while the airport's "purpose and rationale" for collecting the access fee and the concession fee may be exactly the same in both circumstances,[7] this fact is

---

[7] Defendants urge, and Plaintiffs do not dispute, that the purpose of both the access fee and the concession fee is to compensate the airport for the use of airport facilities and services, such as roadways and curbsides, that are used in common with other airport users.

immaterial, as the critical question revolves around the manner in which the fee was imposed.  In this regard, the statute is clear—only those fees that a short-term lessee must pay to airports are exempt from mandatory inclusion in the advertised, quoted, and charged rental rate.

Finally, Defendants provide no authority for the proposition that "the practical construction of [NRS] 482.31575 by all relevant parties—including Nevada officials, local airport authorities, [those in the] rental car industry, and legal counsel—to permit ACRFs to be separately quoted and charged . . . is entitled to great weight and should be adopted and enforced by the court."  *See* Doc. #63, p. 21.  The cases to which Defendants cite simply do not stand for that proposition.  *See Stuhmer v. Centaur Sculpture Galleries*, 110 Nev. 270, 871 P.2d 327, 330 (1994) (finding that "[t]he best approach for courts to use in interpreting a *contract* that is ambiguous is to 'delve beyond the express terms of a written contract' and 'examine the circumstances surrounding the parties' agreement . . . [including the] subsequent acts and declarations of the parties'') (emphasis added); *see also United States Cellular Inv. Co. v. GTE Mobilenet, Inc.*, 281 F.3d 929, 937 (9th Cir. 2002) ("[u]nder California law, a court may consider the subsequent acts and conduct of the parties in the execution of the *contract* in order to determine the intent of those parties") (emphasis added).  Moreover, Defendants' assertion that "all relevant parties" agreed that NRS 482.31575 permitted separate itemization of ACRFs is disingenuous at best.  As the Court will more fully address in rejecting Defendants' "fair notice" defense, the parties to which Defendants refer were not in agreement as to the legal effect of NRS 482.31575, nor were they responsible for interpreting or enforcing the statute.  *See* Section III.A.2. *infra*.  Accordingly, the Court declines to give their understanding of NRS 482.31575 "great weight" as Defendants urge.

### *Legislative History*

Defendants again dispute the Court's interpretation of the statute's legislative history in *Sobel*.  In that case, the Court addressed both the legislative history of the pre-2009 version of the statute, *see Sobel I*, 2007 WL 2710725, *2-3, and the effect of the 2009 amendment, *see Sobel II*, 698 F. Supp. 2d at 1224-26.  Here, however, Defendants fail to present any new evidence to

undermine the Court's earlier determination as to legislative intent.  Accordingly, the Court, again, declines to reconsider its prior findings in this regard.  *See* Doc. #44, p. 7 (declining to reconsider prior ruling).

### 2. Due Process Defense

Defendants also raise an as-applied "fair notice" defense under the Due Process clause of the United States Constitution.  Defendants urge that their experience as on-airport rental car companies was far different than that of Hertz and, thus, the result of this case should not be driven by *Sobel*.  Specifically, Defendants cite the fact that prior to their entry into the on-airport market, they operated as off-airport companies, during which time they separately itemized airport fees on customer invoices in a manner which all parties, including Plaintiffs, concede was in full compliance with NRS 482.31575.  They claim that when they entered the market as on-airport companies, "administrators at McCarran, Nevada law enforcement officials, and all other rental car companies in the market agreed that [NRS 482.31575] allowed [on-airport] companies to itemize the ACRF."  Doc. #63, p. 23.  Accordingly, Defendants argue, NRS 482.31575 failed to provide the requisite reasonable notice to persons of ordinary intelligence of what conduct was permitted or proscribed.

Indeed, "[a] fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required."  *FCC v. Fox Television Stations, Inc.*, 132 S.Ct. 2307, 2317 (2012) (citing *Papachristou v. Jacksonville*, 405 U.S. 156, 162 (1972)).  "A conviction or punishment fails to comply with due process if the statute or regulation under which it is obtained 'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *Id.* (quoting *United States v. Williams*, 553 U.S. 285, 304 (2008)).  "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment."  *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).  Civil laws are held to a less strict

vagueness standard than criminal laws "because the consequences of imprecision are qualitatively less severe."[8]  *Id.* at 498-99.  Additionally, economic regulations are "subject to a less strict vagueness test because . . . businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action."  *Id.*

Whereas here, a defendant raises an "as-applied" challenge, the court must consider "whether a statute is vague as applied to the particular facts at issue," for a defendant "who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."  *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18-19 (2010) (internal quotation marks omitted).  As such, a court need only determine whether the statute was vague "as applied to [that] particular defendant[]"—in other words, whether the defendant "in fact had fair notice that the statute and regulations proscribed [the] conduct."  *United States v. Hsu*, 364 F.3d 192, 196 (4th Cir. 2004).  Because "[o]bjections to vagueness under the Due Process Clause rest on the lack of notice, [they] may be overcome in any specific case where reasonable persons would know that their conduct is at risk."  *Maynard v. Cartwright*, 486 U.S. 356, 361 (1988).

In reviewing a statute's language for vagueness, "we are relegated . . . to the words of the ordinance itself, to the interpretations [other courts have] given to analogous statutes, and perhaps to some degree, to the interpretation of the statute given by those charged with enforcing it."  *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972) (internal quotation marks and footnotes omitted).  Because legislators are "[c]ondemned to the use of words, we can never expect mathematical certainty from [their] language."  *Id.*  As such, courts are to be "mindful that 'due

---

[8]  Defendants cite *LVRC Holdings LLC v. Brekka* for the proposition that, whereas here, a statute has both civil and criminal applications, the due process analysis is the same.  *See* Doc. #63, p. 16.  In *LVRC Holdings*, the Ninth Circuit stated that where a statute has both civil and criminal applications "courts should *interpret the statute consistently in both criminal and noncriminal contexts.*" 581 F.3d 1127, 1135-36 (9th Cir. 2009) (citing *Leocal v. Ashcroft*, 543 U.S. 1, 11 n.8 (2004)) (emphasis added).  The Ninth Circuit did not, however, state that the due process analysis is the same in both the criminal and civil contexts.  Nor is the Court inclined to extend the Ninth Circuit's pronouncement in this manner.  Nevertheless, the Court finds that Defendants had fair warning of the proscribed conduct under either vagueness standard.

1 process does not demand unattainable feats of statutory clarity,' . . . and that 'absolute precision in

2 drafting laws is not demanded,' particularly where the law does not impose a criminal penalty."

3 *Planned Parenthood of Cent. & N. Ariz. v. State of Ariz.*, 718 F.2d 938, 948 (9th Cir. 1983)

4 (quoting *United States v. Maude*, 481 F.2d 1062, 1068 (D.C. Cir. 1973); *High Ol' Times, Inc. v.*

5 *Busbee*, 673 F.2d 1225, 1229 (11th Cir. 1982)).  Here, the Court finds that a reasonable reading of

6 the statute, in light of its legislative history and purpose, as well as the interpretations thereof by

7 relevant authorities, afforded Defendants fair notice that their conduct was at risk.

8      Defendants urge that, because the Court has already made a finding that the statute was "an

9 ambiguous and poorly-drafted statute that is capable of being understood in two or more senses," it

10 could not have provided "person[s] of ordinary intelligence fair notice of what is prohibited."  *See*

11 Doc. #63, p. 17; *see also Sobel I*, 2007 WL 2710725, at *2 ("[i]n light of the substantial uncertainty

12 surrounding section 482.31575's requirements, it would be difficult to establish that Hertz

13 intentionally circumvented the requirements of the statute").  However, Defendants assume too

14 much in reaching this conclusion.  That a statute is ambiguous and poorly-drafted does not render it

15 violative of due process.  Indeed, "[s]ubstantial numbers of lawsuits arise out of disagreements over

16 the precise meaning of a statute.  The potential for such differences of opinion cannot be enough to

17 render a statute void for vagueness."  *Planned Parenthood*, 718 F.2d at 948.  In *Sobel*, the Court

18 found that NRS 482.31575's ambiguities "require[d] . . . consider[ation of] the intended meaning

19 of the words . . . as well as [the] legislative intent underlying the statute."  *Sobel I*, 2007 WL

20 2710725, at *2.  Ultimately, the Court resolved these ambiguities by holding "that the legislature

21 intended that the words 'any fees paid to airports' be used and understood as any fees paid directly

22 to airports by short-term lessees."  *Id.*

23      Moreover, the statutory terminology at issue—"any fees paid to airports"—is vastly

24 different from the sort that courts have previously declared to be vague.  *See Humanitarian Law*

25 *Project*, 561 U.S. at 20 (noting that "in the past, [the court has] 'struck down statutes that tied

26 criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly

subjective judgments without statutory definitions, narrowing context, or settled legal meanings")
(quoting *Williams*, 553 U.S. at 306) (internal quotation marks omitted).  NRS 482.31575 simply
does not implicate any concern over subjective judgment.  Nor is the statute without narrowing
context such that the companies to which it applied would not have had notice of the prohibited
conduct at issue.  Indeed, the manner in which the exception was narrowed—only those fees paid to
airports—falls squarely in line with the consumer protection purpose of the statute.  Accordingly,
for all of the aforementioned reasons, the Court rejects Defendants' contention that the statute itself
was so vague that it failed to provide them with fair notice of the prohibited conduct.

Defendants further argue that "*all* affected parties—the car rental companies, the airport
administrators, and the Nevada law enforcement officials[9]—all had considered the language of
[NRS] 482.31575 prior to the time of Plaintiffs' rental transactions, and they all believed that
separately itemizing the ACRF was legal and permissible."  *See* Doc. #63, p. 18.  Central to
Defendants' argument in this regard is an assumption that because "*all* affected parties"
misunderstood the statute, it could not possibly have provided the requisite "fair notice" under the
Due Process clause.  The Court perceives two problems with Defendants' argument.  First,
Defendants' assertion that "all relevant parties—including Nevada officials, local airport
authorities, [those in the] rental car industry, and legal counsel"—construed the statute to permit
ACRFs to be separately quoted and charged is disingenuous at best.  Second, none of the affected
parties who supposedly believed that NRS 482.31575 allowed the separate itemization of the
ACRFs were charged with its implementation or enforcement.  The Court will address each of
these issues in turn.

While Defendants urge that *all* affected parties believed that NRS 482.31575 allowed the
separate itemization of ACRFs, the evidence is far from clear in that regard.  Specifically,
Defendants cite the opinions of Hertz, and other on-airport rental car companies; Las Vegas

---

[9] Defendants concede that the "law enforcement" officials to which they refer were not actually
law enforcement officials at all.  Rather, Nevada peace officers and the Department of Transportation
are responsible for enforcement of NRS 482.31575.  *See* Doc. #63, p. 18.

1   Attorney, Zev E. Kaplan ("Kaplan"); Clark County Deputy District Attorney, Lee Thompson

2   ("Thompson"); and former Clark County Director of Aviation, Randall Walker's ("Walker"), all of

3   which arose in the context of an attempt by Hertz in the early 1990s to "level the playing field"

4   between on-airport and off-airport rental car companies.

5   First, Defendants argue that Hertz and other on-airport rental car companies reasonably

6   believed that they could separately itemize the amount of airport fees were it not for the contractual

7   obligation to bundle the airport fees with the base rental rate. *See id.* at 3. Indeed, the Concession

8   Agreements in effect before December 1995 required on-airport rental car companies to bundle the

9   ACRF with the base rental rate.[10]   *See* Doc. #65 (Walker Decl.), ¶16. In contrast, off-airport

10   companies were allowed to advertize and quote their base rental rate without including the access

11   fee. *Id.* As a result of this differential treatment, off-airport rental car companies became more

12   competitive, displacing business from on-airport rental car companies. *See id.* In response, Hertz

13   and other on-airport rental car companies lobbied for passage of Senate Bill 396 ("SB 396") in an

14   attempt to remove the phrase "any fees paid to airports" from NRS 482.31575 so that off-airport

15   rental car companies would also be required to bundle their fees.[11]   *See id.*; *see also* Doc. #69-4

16   (Scancarelli Decl.), Ex. 3. Numerous off-airport rental car companies, including Enterprise and

17   Alamo, opposed SB 396. *See* Doc. #23-5 (O'Brien Decl.), Ex. C-1, pp. 20-30; *see also* Doc. #69-4

18   (Scancarelli Decl.), Ex. 3, pp. 5-18 (Mason Hurst's, of Alamo, testimony before the Senate

19   Committee on Transportation in opposition to the bill). Ultimately, the Nevada State legislature

20   declined to adopt SB 396. *See* Doc. #65 (Walker Decl.), ¶16. Clark County did, however, amend

21   Ordinance 20.09.010 such that off-airport rental car companies were required to collect and pay

22   eight percent of their gross revenue from rental car customers to the airport. *See id.*

23

---

24   [10] Since December 1995, the Clark County Department of Aviation has permitted "on-airport"
      rental car companies to separately itemize ACRFs on customer invoices. Doc. #65 (Walker Decl.),
25   ¶12.

26   [11] Defendants admission in this regard indicates that Hertz and other on-airport rental car
      companies believed that NRS 482.31575 exempted off-airport access fees.

In a further effort to persuade McCarran officials to drop the bundling requirement, Hertz sought a legal opinion regarding the application of NRS 482.31575 to the fees imposed at McCarran under its existing Concession Agreements with Clark County.  *See id.*, ¶17, Ex. D.  Las Vegas Attorney, Kaplan, opined that NRS 482.31575 actually prohibited rental car companies from bundling "airport fees" in the advertising, quoting, and charging of rental car rates.  *Id.*  After reviewing Kaplan's opinion, then Clark County Director of Aviation, Robert Broadbent ("Broadbent"), sought advice from the airport's legal counsel, Clark County Deputy District Attorney, Thompson.  *See id.*, ¶17, Ex. E.  In response thereto, Thompson stated that "[t]here is a valid concern that the statute precludes the inclusion of the concession fees charged by the County from being included in the advertised, quoted, and charged car rental rates.  This may be an appropriate question to put to the Attorney General."  *Id.*  Based on Thompson's concern, McCarran waived the contractual provision requiring on-airport rental car companies to bundle the ACRFs with the base rental rates.  *See id.*, ¶18.  Thereafter, in revising its Concession Agreements, McCarran expressly permitted on-airport rental car companies to separately itemize the ACRF on customer invoices.  *See id.*, ¶19.  Randall Walker ("Walker")[12] testified that "[a]t all times since December 1995, the [Clark County] Department of Aviation has permitted on-airport rental car companies to separately itemize on customer invoices the proportionate amount of concession fees to be paid to the County for the privilege of using airport roadways, curbsides, and other airport facilities and services.  Such was the practice of the existing on-airport rental car companies in 2002, when both Enterprise and Alamo were awarded airport concessions and switched from being off-airport to on-airport companies."  *Id.*

As the aforementioned evidence demonstrates, the "affected parties" simply did not agree that NRS 482.31575 unequivocally permitted the separate itemization of ACRFs.  First, the fact that Hertz and other on-airport rental car companies objected to the off-airport practice of separately itemizing the access fees paid to the airports is not evidence that they believed they could

---

[12]  Walker was the Clark County Director of Aviation when Defendants went on-airport.

do so as well under NRS 482.31575.  In fact, that they pursued a legal opinion as to the statute's

mandate at a time when they were bundling ACRFs indicates that they believed the statute to be

susceptible to such a requirement.  Second, only Kaplan opined that NRS 482.31575 prohibited the

bundling of ACRFs.  Third, Thompson merely opined that the statutory language was not "entirely

clear," and advised that an inquiry to the Attorney General may be appropriate.  He did not,

however, indicate an opinion as to whether NRS 482.31575 permitted the separate itemization of

ACRFs.  Nor is there any indication that the Attorney General was consulted or issued an opinion

on the subject.  Fourth, the fact that McCarran dropped the requirement that on-airport rental car

companies bundle the ACRF on customer invoices is not evidence of a belief that NRS 482.31575

permitted the separate itemization of ACRFs.  Clark County's Concession Agreements permitted

rental car companies to unbundle the ACRFs "provided that [they] . . . comply with all applicable

laws."[13]  As such, the Airport Authority clearly recognized the possibility that other laws would

_____

[13]  To the extent Defendants argue that the RTI Airport Authority required them to charge their customers a separate ACRF, the Court disagrees.  Section 1.13 of the Concession Agreement to which Defendants refer requires that "[c]oncessionaire shall *list separately on any customer rental agreements, contracts or invoices*, the concession fee payable by the [c]oncessionaire to the [Airport] Authority for the privilege of doing business at the Airport under this Agreement. . . . Concessionaire shall not in any way attribute such amounts or the charging of such amounts to the [Airport] Authority or the Airport."  Doc. #66, Ex. C, p. 6; Doc. #66, Ex. D, p. 6.  In contrast, NRS 482.31575 requires short-term lessors to "*advertise, quote and charge* a rate for leasing a passenger car that includes the entire amount . . . ."  The Court interpreted this requirement to include the ACRFs that concessionaire/lessors pass along to short-term lessees.  *See Sobel I*, 2007 WL 2710725, at *2.  That a concessionaire might be required to *list* separately on customer rental agreements, contracts, and invoices the fact that the base rental rate is comprised of an ACRF does not conflict with NRS 482.31575's requirement that the ACRF be included in the advertised, quoted, and charged base rental rate.  Accordingly, the Court finds that the Concession Agreement to which Defendants refer does not preclude compliance with NRS 482.31575.

Moreover, the language in the Concession Agreement to which Defendants refer provides further support for the Court's interpretation of the NRS 482.31575.  Specifically, section 1.13 explicitly recognizes that the concession fee is payable by the concessionaire to the airport and further warns that the "[c]oncessionaire shall not in any way attribute such amounts or the charging of such amounts to the [Airport] Authority or the Airport."  The RTI Airport Authority obviously understood that the concession fee payable by the concessionaire to the airport was separate and distinct from the

dictate whether the rental car companies could unbundle the ACRFs.  *Id.*, Ex. B. p. 11.  Finally, Walker's testimony that he and all others "always read, understood, and applied the statute" to permit "the amount of any fees that the [on-airport] companies paid to the airport, including the ACRF, to be separately itemized" is contradicted by the RTI Airport Authority's 2004 request for bids from car rental companies seeking concessions at the airport.  In response to an inquiry as to why the requirement that ACRFs be separately stated was deleted, the Airport Authority responded that "[t]he Concession Fee is a cost of doing business, owed by the Concessionaire, not by its customers to the [Airport] Authority pursuant to the Concession Lease[.]"  Doc. #90-5, Ex. 4, pp. 8-9.  In a 2004 addendum, the Airport Authority reiterated that "the [Concession Fee] is a cost of doing business to the concessionaire and not a pass-through tax on the rental customer."  Doc. #90-6, Ex. 5, p. 4.  Accordingly, the Court rejects Defendants' contention that *all* affected parties believed that NRS 482.31575 permitted the separate itemization of ACRFs.  The evidence in this regard speaks for itself.

Nevertheless, ignoring for a moment the indisputable fact that *not all* affected parties definitively believed that NRS 482.31575 permitted the separate itemization of ACRFs, Defendants fail to cite any authority for the proposition that the opinions on which they allegedly relied are authoritative interpretations of the statute such that they are entitled to any weight in the Court's determination of whether the statute provided fair notice.  As noted above, none of the affected parties who supposedly believed that NRS 482.31575 allowed the separate itemization of ACRFs

_____

ACRF that the concessionaire might charge to its customers as a way of recouping the cost of the concession fee.

Finally, the agreements between RTI and Alamo and RTI and Enterprise to which Defendants refer were executed in 1997 and 1998, respectively, and Defendants admit that this form of agreement did not govern the parties relations at the time the Plaintiffs rented their vehicles.  *See* Doc. #66, Ex. C, p. 48; Doc. #66, Ex. D, p. 48.  In this regard, Defendants admit that the RTI Concession Agreement in effect after July 1, 2005 did not require "on-airport" rental car companies to charge its customers a separate ACRF.  *See* Doc. # 85, ¶8.  Rather, these contracts were silent as to the manner in which the ACRF could be stated on customer invoices.  *See* Doc. #73-7, Ex. 6.

were charged with its implementation or enforcement.[14]  *See Roberts v. State of Nevada*, 104 Nev. 33, 752 P.2d 221, 225 (1988) ("constructions of state statutes by administrative agencies charged with their implementation are entitled to great weight"); *see also Grayned*, 408 U.S. at 110 (finding "the interpretation of the statute given by those charged with enforcing it" relevant "perhaps to some degree" in a court's analysis of the statute's vagueness).  Accordingly, those beliefs are not entitled to the weight Defendants suggest they are.

In this regard, *Chalmers v. Los Angeles*, 762 F.2d 753 (9th Cir. 1985), is clearly distinguishable.  In *Chalmers*, the plaintiff received a seller's permit to sell t-shirts at the Los Angeles Museum of Art from the California State Board of Equalization and a Business Tax Registration Certificate from the City's Tax and Permit Division.  *Id.* at 755.  Nevertheless, "[g]iven the obvious ambiguity in [the applicable] ordinances, [the plaintiff] sought . . . to clarify the meaning of the regulation[s] by resort to City officials."  *Id.* at 758.  The City Clerk's Office reassured her that her planned activities were permitted.  *Id.* at 756.  Thereafter, the plaintiff was harassed, threatened with arrest and prosecution and ultimately prevented from selling her t-shirts.  *Id.*  The Ninth Circuit found that Los Angeles' "ordinance scheme itself was [not] necessarily a violation of due process.  Rather the due process violation occurred in the manner in which [the facially] inconsistent scheme was implemented and enforced."  *Id.* at 758.  Specifically, the Ninth Circuit noted that:

> [t]his system-wide lack of coordination [(i.e., one branch of government advising the plaintiff that an ordinance permitted her planned activities, while another branch of government enforced a conflicting ordinance)] could not have been prevented by [the plaintiff].  She did everything possible to obtain clarification of the vending laws.  The City failed to support a uniform interpretation of the facially inconsistent ordinances despite an obvious need to take further steps to minimize the dangers of arbitrary enforcement.

*Id.* at 759 (internal quotation marks and citation omitted).

///

---

[14]  The Court previously found that whether "airport authorities had the power to impose and collect fees is beside the point."  *See* Doc. #44, p. 7.

Here, there is no indication that Defendants themselves received any comparable reassurance from an authority charged with the implementation or enforcement of NRS 482.31575. Moreover, while not fatal to their void-for-vagueness defense, the fact that Defendants never sought clarification as to their legal obligations under NRS 482.31575 is damaging nonetheless. Indeed, "vagueness concerns diminish when the regulated person has 'the ability to clarify the meaning of the regulation . . . by resort to an administrative process.'" *Carrigan v. Comm'n on Ethics of State*, 129 Nev. Adv. Op. 95, 313 P.3d 880, 886 (2013) (quoting *Vill. of Hoffman Estates*, 455 U.S. at 498). Here, there is no indication of an administrative or official process by which Defendants might have sought clarification as to the meaning of NRS 482.31575. Nevertheless, Defendants certainly had the opportunity to seek guidance via an inquiry to the Attorney General. In fact, Thompson recommended precisely this. Instead, Defendants relied on others' unauthoritative and flawed interpretation of the statute. Unfortunately for Defendants, due process does not afford relief merely because "everyone else was doing it."

Finally, to the extent Defendants argue that Plaintiffs rented cars at fair market prices with the ACRFs fully and accurately disclosed in advance in compliance with the terms of McCarran's Concession Agreements, the Court is unpersuaded. First, whether the Plaintiffs rented vehicles at fair market prices with advance notice that the total amount included the ACRF is immaterial to a determination of whether Defendants had fair notice of the conduct which NRS 482.31575 proscribed. Moreover, in *Sobel*, the Court specifically distinguished between the permissible practice of *charging* customers an ACRF and the prohibited practice of charging such a fee *while advertising and quoting* a base rental rate that does not include the ACRF. *See Sobel I*, 2007 WL 2710725, *4 ("The issue . . . is not whether airport concession fees may be charged to customers, the issue is whether such charges must be reflected within the rate advertised and quoted to customers."). Finally, the Court has already rejected as a matter of law Hertz's argument that the plaintiffs' claims were barred because the named plaintiffs paid their rental charges with full knowledge of the fee they now claim is improper. *See Sobel II*, 698 F. Supp. 2d at 1222-24

1  (concluding that Hertz may not rely on the voluntary payment doctrine as a defense to the

2  plaintiffs' claims).

3        Recognizing that a statute is unconstitutionally vague if it misleads the individuals it

4  regulates into thinking that their conduct is not proscribed, *see Gentile v. State Bar of Nev.*, 501

5  U.S. 1030, 1048 (1991), the Court is unpersuaded that NRS 482.31575 is one such statute.  The

6  statute itself, while ambiguous, was not so vague that it failed to "provide people of ordinary

7  intelligence a reasonable opportunity to understand what conduct it prohibits."  *See S.O.C., Inc. v.*

8  *Cnty. of Clark*, 481 F. Supp. 2d 1122, 1134 (D. Nev. 2007) (citing *Hill v. Colo.*, 530 U.S. 703, 732

9  (2000)).  While Defendants may disagree with the Court's interpretation of NRS

10  482.31575—preferring instead the interpretation of others in the industry—the fact remains that

11  Defendants had fair notice of the statute and its potential application to their conduct.  Accordingly,

12  the Court rejects Defendants' due process defense.

13          **3.**     **Conclusion**

14        In sum, it is undisputed that the ACRF that Defendants charged to their customers is

15  separate and distinct from the concession fee that the airports charge Defendants.  Moreover, it is

16  undisputed that Defendants failed to include the ACRF in their base rental rate and instead passed

17  on the concession fee as a surcharge on top of that base rental rate.  As such, no genuine issues of

18  material fact remain concerning whether Defendants' pricing practices violated NRS 482.31575.

19  Finally, because NRS 482.31575 afforded fair warning of the conduct that was proscribed,

20  Defendants are not entitled to a due process defense.  Summary judgment in favor of Defendants is

21  therefore denied.

22      **B.**     **Defendants' Motion for Summary Judgment on Damages and Restitution**

23        Defendants also seek an adjudication by the Court that Plaintiffs are not entitled to a money

24  judgment for their statutory violation of NRS 482.31575.  In essence, Defendants argue that

25  Plaintiffs incurred no damages and Defendants retained no economic benefit as a result of their

26  failure to comply with NRS 482.31575.  NRS 482.31585 (the "remedial statute") provides for a

1   cause of action for "damages and appropriate equitable relief" for violations of NRS 482.31575.

2   While the statute does not further define "damages," the Court shall construe the term to mean

3   *actual* damages in accordance with the Plaintiffs' Second Amended Complaint. *See* Doc. #11, p.

4   11 (praying for "damages . . . in the full amount of the injuries determined to have been sustained

5   by them").  Insofar as Plaintiffs seek actual damages pursuant to NRS 482.31575, they must

6   establish that they have been injured or suffered a loss.  *See Davis v. Beling*, 128 Nev. Adv. Op. 28,

7   278 P.3d 501, 512 (2012) ("'actual damages' are defined as '[a]n amount awarded to a complainant

8   to compensate for a proven injury or loss'") (quoting *Black's Law Dictionary* 445 (9th ed. 2009));

9   *see also Mort Wallin of Lake Tahoe, Inc. v. Commercial Cabinet Co.*, 105 Nev. 855, 784 P.2d 954,

10  955 (1989) ("[t]he party seeking damages has the burden of proving both the fact of damages and

11  the amount thereof").

12         Viewing the evidence in the light most favorable to Plaintiffs, the Court finds that Plaintiffs

13  failed to establish that they suffered any *actual* damages.  As the Court has stated on numerous

14  occasions, this case does not concern the propriety of charging the ACRFs; rather, it concerns only

15  the manner in which the ACRFs were charged.  *See* Doc. #44, p. 6 ("[t]he issue . . . is not whether

16  airport concession fees may be charged to customers, the issue is whether such charges must be

17  reflected within the rate advertised and quoted to customers") (citing *Sobel I*, 2007 WL 2710725, at

18  *4).  As such, Plaintiffs cannot demonstrate that they were harmed merely by virtue of the fact that

19  Defendants charged an ACRF.  Instead, Plaintiffs must demonstrate that they were harmed by the

20  manner in which the Defendants charged the ACRF.  In this regard, Plaintiffs allege that they were

21  harmed when Defendants charged a higher total rate than they otherwise could have charged had

22  they complied with NRS 482.31575.  *See* Doc. # 11, ¶14.  However, Plaintiffs' allegation in this

23  regard is pure conjecture as they fail to proffer any evidence in support thereof.  Instead, Plaintiffs

24  offer that imposing the ACRF as an unbundled fee must have been profitable to Defendants

25  because they continued to do so even after the Court's ruling in *Sobel*.  *See* Doc. #88, p. 3.  While

26  Plaintiffs' theory in this regard is appealing, it does not constitute evidence sufficient to overcome

1   summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986) (plaintiff

2   "may not rest upon the mere allegations or denials of [the defendant's] pleading, but . . . must set

3   forth . . . sufficient evidence supporting the claimed factual dispute") (quoting *First Nat'l Bank of*

4   *Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288-89 (1968)) (internal quotation marks omitted).

5           Defendants, on the other hand, present sworn expert testimony that "[t]he prices Plaintiffs

6   paid reflect the fair market value of the vehicle rentals at the time they occurred, and the total cost

7   to Plaintiffs would have been the same whether the ACRF was 'bundled' with the vehicle rental

8   rate or not."  *See* Doc. #67 (Harris Decl.), ¶¶4-6.  In response, Plaintiffs offer an unsworn "rebuttal"

9   to Robert G. Harris' ("Harris") Expert Report in which Gilbert R. Coleman ("Coleman") contests

10  the validity of Harris' conclusion.  *See* Doc. #88, Ex. 1.  Ignoring for a moment the fact that

11  Coleman's statement is unsworn, and thus inadmissible,[15] the Court nevertheless finds that his

12  "rebuttal" and counter-theory that "100% of the ACRF are damages" are insufficient to

13  demonstrate the existence of a genuine dispute as to actual injury.  Plaintiffs present no evidence of

14  what the fair market value of the rental vehicles would have been if Defendants had bundled the

15  ACRF properly.  As such, the Court has no reasonable basis on which to find or calculate actual

16  damages and any attempt to do so would be improperly speculative.  *See Bader v. Cerri*, 96 Nev.

17  352, 609 P.2d 314, 357 (1980) (where "a reasonable method for ascertaining the extent of damage

18  is offered through testimony, the fact that some uncertainty exists as to the actual amount of

19  damage sustained, does not preclude recovery") (citing *Brown v. Lindsay*, 68 Nev. 196, 228 P.2d

20  262 (1951)), overruled on other grounds by *Evans v. Dean Witter Reynolds, Inc.*, 116 Nev. 598, 5

21  P.3d 1043 (2000).  Because Plaintiffs have failed to prove the existence and extent of damages, the

22  Court finds that summary judgment in favor of Defendants is appropriate on this basis.

23  ///

24

25          [15] *See Shuffle Master, Inc. v. MP Games LLC*, 553 F. Supp. 2d 1202, 1210-11 (D. Nev. 2008)

26  ("an unsworn expert report is inadmissible"); *see also* Fed. R. Civ. P. 56(e); Fed. R. Evid. 603 (to be
    admissible, testimony must be sworn).

Insofar as Plaintiffs seek restitution of class members' unlawful payments to Defendants, the Court determines the request to be "appropriate equitable relief" in accordance with the remedial statute.  As Defendants are undoubtedly aware, in *Sobel*, the Court determined that restitution was an appropriate equitable remedy under both the remedial statute and on the plaintiffs' claim for unjust enrichment.  *See Sobel v. Hertz Corp.*, 291 F.R.D. 525, 538-42 (D. Nev. 2013) (No. 3:06-cv-545-LRH-RAM, Doc. #332) (order on motions for summary judgment and class certification) ("*Sobel III*").  Therein, the Court cited three bases on which the equitable remedy of restitution is available in Nevada.

> First, "[u]njust enrichment exists when the plaintiff confers a benefit on the defendant, the defendant appreciates such benefit, and there is 'acceptance and retention by the defendant of such benefit under circumstances such that it would be inequitable for him to retain the benefit without payment of the value thereof.'" *Certified Fire Protection Inc. v. Precision Construction*, 283 P.3d 250, 257 (Nev. 2012) (quoting *Unionamerica Mortgage and Equity Trust v. McDonald*, 97 Nev. 210, 626 P.2d 1272, 1273 (1981)). Second, Nevada courts have awarded restitution where the award was necessary to effectuate the purpose of some regulatory regime, even absent a showing of unjust enrichment. *See Feldman v. State*, 96 Nev. 614, 615 P.2d 238, 241 (1980); *Southwest Gas Corp. v. Public Service Commission*, 96 Nev. 657, 614 P.2d 1080, 1082 (1980).

*Id.* at 538-39.  Third, the Court found "independent reasons why restitution is a viable remedy," including "when a contractual provision is unenforceable due to illegality, at least where restitution effectuates the statutory purpose." *Id.* at 539-40 (citing Restatement (Third) of Restitution & Unjust Enrichment §32(1) (2011); Dan B. Dobbs, *Law of Remedies: Equity, Damages, and Restitution* § 13.6 (2d ed. 1993)).

Here too, Plaintiffs have established that Defendants collected and retained an unlawful payment—the unbundled ACRF.[16]  Accordingly, they are entitled to restitution in the amount of the unlawfully collected ACRF.  *See Sw. Gas Corp. v. Pub. Serv. Comm'n*, 96 Nev. 657, 614 P.2d 1080, 1082 (1980) (finding that customers were entitled to a "refund" of the amounts that could not

---

[16]  Because the ACRF that short-term lessees pay to Defendants is separate and distinct from the concession fee Defendants pay to the airports, the fact that Defendants collected the unbundled ACRF is, in and of itself, sufficient proof that Defendants were unjustly enriched.

legally be charged); *see also Feldman v. State*, 96 Nev. 614, 615 P.2d 238, 241 (1980) (finding that defendant who procured the fees without authority was not entitled to retain them).

Defendants have failed to put forth any principled argument as to why the Court should depart from the reasoning set forth in *Sobel*. First, Defendants argue that Plaintiffs are not entitled to restitution because they were not unjustly enriched when they collected money from customers in the form of an ACRF and remitted those funds to the airports as concession fees. Defendants' assertion in this regard is premised on the faulty notion that the concession fee and the ACRF are one and the same. The Court has already rejected Defendants' argument in this regard, finding that the concession fee and the ACRF are separate and distinct. That Defendants may have used funds from the ACRFs to defray the expense of their independent obligation to pay concession fees to the airports does not change the fact that they retained the proceeds of the improper ACRF. Moreover, that Defendants may have lawfully expended the ACRF proceeds for the benefit of Plaintiffs or that Plaintiffs may have ultimately benefitted from their payments to Defendants is irrelevant. *See Stolz v. United Brotherhood of Carpenters & Joiners, Local Union No. 971*, 620 F. Supp. 396, 401 (D. Nev. 1985) (finding that restitution was a proper remedy even where the illegally collected dues were lawfully expended for the members benefit). Finally, the Court rejects Defendants' somewhat confused argument that awarding a money judgment would result in a penalty or forfeiture to Defendants and a windfall to Plaintiffs. Quite simply, Defendants imposed an ACRF on Plaintiffs in a manner that was contrary to Nevada law. Allowing Defendants to retain this unlawfully collected benefit would be inequitable under the circumstances.

Next, Defendants attempt to distinguish *Feldman* and *Southwest Gas* by arguing that the Plaintiffs in this case are without prosecutorial discretion "to impose penalties and pocket the proceeds as if they were exercising governmental enforcement authority and discretion" is severely misguided.[17] Here, however, the remedial statute explicitly provides for a private right of action for

---

[17] In *Sobel*, the Court cited *Feldman* and *Southwest Gas* for the proposition that Nevada courts have approved of restitutionary award without a showing of actual injury. *Sobel III*, 291 F.R.D. at 539.

24

"damages and appropriate equitable relief" for violations of NRS 482.31575.  Defendants cannot

seriously challenge that Plaintiffs have the right to seek just that—damages and appropriate

equitable relief.  In *Feldman*, the Nevada Supreme Court determined that because Feldman had

procured the "service fees" without authority, he was not entitled to retain them.  615 P.2d at 241.

The court further found that requiring Feldman to return the fees was "justified and valid."  *Id.*

Additionally, in *Southwest Gas*, the Nevada Supreme Court approved of a similar remedy where a

utility company had overcharged its customers for natural gas.  614 P.2d at 1082.  That the Nevada

Supreme Court did not characterize the "penalty order" in either of these cases as "restitution" or

"equitable relief" does not change the nature of the remedy or its purpose—to disgorge the

unlawful payment from the wrongdoer.  Moreover, Defendants' insinuation that Plaintiffs must

prove actual damages in order to enforce their right to appropriate equitable relief is similarly

misplaced.[18]  As the Court fully explained in *Sobel*, Defendants' reasoning in this regard would

eliminate the distinction between restitution and compensatory damages.  *Sobel III*, 291 F.R.D. at

538-40.

Defendants next challenge that "restitution is an available remedy when a contractual

provision is unenforceable due to illegality, at least where restitution effectuates the statutory

purpose."  *See id.* at 540 (citing Restatement (Third) of Restitution & Unjust Enrichment § 32(1)

(2011)).  Specifically, Defendants argue that section 32 of the Restatement is only applicable where

"'a party who has rendered a valuable performance pursuant to an agreement that the law condemns

as illegal or otherwise prohibits' is prohibited from receiving the benefit of the contractual bargain

because 'neither party to such a contract can enforce it to obtain the promised exchange.'"  Doc.

---

[18] *Perrone v. General Motors Acceptance Corporation*, to which Defendants cite, is completely inapposite as the court therein determined only that detrimental reliance was an element of actual damages under the Truth in Lending Act ("TILA").  232 F.3d 433, 438-39 (5th Cir. 2000).  In contrast to the remedial statute in this case, which sets forth an explicit right to "appropriate equitable relief," the court in *Perrone* further determined that TILA does not confer upon private litigants an implied right to equitable relief.  *See id.* at 439 ("If Congress had meant for restitution to be the measure of actual damages, it could have easily said so in the statute.  It did not.").

#64, p. 14 (citing Restatement § 32, comment a.).  However, Defendants miss the point when they argue that "[r]enting a car at the airport is not a transaction that the law condemns and refuses to enforce."  The Court did not declare the transaction itself to be illegal.  Rather, the Court determined that a single provision of the contract—the unbundling of the ACRF—violated the law.  Whereas here, "the violation of a regulatory statute provides the grounds for enforceability, '[r]estitution is [ ] available . . . unless the court concludes that the allowance of restitution would defeat the policy of the regulation in question.'"  *Sobel III*, 291 F.R.D. at 540 (citing Restatement §32, comment e.).  Moreover, "restitution is especially appropriate when the statutory purpose would be undermined by the failure to award restitution."  *Id.* (citing *Stock v. Meek*, 35 Cal. 2d 809, 221 P.2d 15, 21 (1950) (Traynor, J.) (awarding restitution of excess interest in a usury case even though plaintiff expressly agreed to usurious rate).

Defendants further argue that restitution is unavailable to Plaintiffs here because the supposedly unenforceable contract has been fully performed.  Defendants' argument in this regard demonstrates their misunderstanding of both the Restatement and the Court's ruling in *Sobel*.[19]  In *Sobel*, the Court did not premise its award of restitution on § 32(2), which requires a showing of unjust enrichment.  Rather, the Court relied on § 32(1), which does not depend on unjust enrichment.  Comment f., to which Defendants cite for the above proposition, expressly states that "[i]f the prohibited transaction has been completed on both sides, restitution will nevertheless be available in cases governed by § 32(1), because the remedy in such cases is independent of unjust enrichment."  Instead, statutory purpose justifies an award of restitution under these circumstances.  In this regard, Illustration No. 1, to which the Restatement refers for cases within § 32(1) is more apt.

---

[19]   Defendants reference to Illustration No. 22 is similarly misplaced as it exemplifies an entirely different set of circumstances whereby "the claim to reverse a completed exchange depends on a showing of unjust enrichment."  Moreover, the hypothetical deals with a situation in which the ordinance requiring registration was not at issue under the lease agreement between landlord and tenant.  In contrast here, the agreement between Defendants and Plaintiffs, pursuant to which Defendants unlawfully charged Plaintiffs an ACRF, directly implicates the statute at issue.

A borrows money from B at a market rate of interest that the laws of the jurisdiction condemn as usurious, then repays the loan in accordance with its terms. The statute regulating the parties' transaction affords defensive relief only: it provides that the borrower may not be compelled to pay interest exceeding the stated maximum, but it is silent on the borrower's right to restitution of excess interest paid. A has a claim against B under the rule of § 32(1) to recover interest paid in excess of the amount to which the debt could have been legally enforced. A's claim in restitution does not depend on the state of mind of either party, nor on a showing that B was unjustly enriched by receipt of interest at a market rate.

Similarly here, Defendants charged Plaintiffs an ACRF in violation of Nevada law. Accordingly, Plaintiffs have a claim against Defendants under § 32(1) to recover the unlawfully collected ACRF. As with Illustration No. 1, the balance of the contract remains enforceable and is unaffected by Plaintiffs' claim for restitution.[20] While the Court agrees with Defendants that NRS 482.31575 does not purport to regulate or limit the amount of money exchanged between private parties,[21] this simply does not affect the availability of restitution as an equitable remedy under the remedial statute where Defendants nevertheless collected an ACRF in violation of NRS 482.31575. On this point, the remedial statute itself is dispositive.

Moreover, Defendants assertion that Plaintiffs enjoyed the full benefit of the ACRF when they used the airport roadways and curbsides to access the terminal again improperly assumes that

---

[20] While Plaintiffs' contracts explicitly provide for severability, this factor does not weigh on the Court's finding in this regard. *See* Doc. #66, Ex. E, ¶14 ("If any provision of this Agreement is determined to be unlawful, contrary to public policy, void or unenforceable, all remaining provisions shall continue in full force and effect.").

[21] Defendants refer to NRS 482.31575 as "economically neutral" because it does not limit the dollar amount that they could charge and collect. While the Court agrees that NRS 482.31575 does not impose a ceiling on the dollar amount that Defendants may charge and collect in the same way that a usury statute does, the Court does not agree with Defendants' characterization of the statute as "economically neutral." By requiring that short-term lessors advertise, quote and charge a rate that includes the entire amount, subject only to exceptions which have no applicability here, NRS 482.31575 implicitly prohibits short-term lessors from advertising, quoting, and charging a rate which does not include the entire amount. This is tantamount to limiting the amount that short-term lessors may require a short-term lessee to pay to that which has been properly advertised, quoted, and charged as the "entire amount." Accordingly, NRS 482.31575 is not "economically neutral." Defendants required Plaintiffs to pay a rate that included an ACRF that was not properly advertised, quoted, and charged as the "entire amount." As such, Plaintiffs paid a greater amount that was permitted by NRS 482.31575.

1    the ACRF and the concession fees are one and the same.  Defendants attempt to conflate the

2    performance due pursuant to each of these agreements remains unavailing.  The benefit to which

3    they refer—use of airport roadways and curbsides to access the terminal—is, in fact, a benefit they

4    enjoy in return for payment of the concession fee to the airports.  Defendants assertion to the

5    contrary—that they "have no occasion to traverse airport roadways and curbsides except to

6    transport customers like Plaintiffs to and from their rental cars"—is remarkably disingenuous.

7    Defendants undeniably benefit from the use of airport roadways and curbsides as it allows them to

8    maintain and operate a rental car business at the airport.

9         To the extent Defendants argue that a money judgment to Plaintiffs would not effectuate

10   any statutory purpose of NRS 482.31575, the Court flatly disagrees.  As Defendants concede, in

11   *Sobel*, the Court identified three potential policies behind the statute: (1) regulating competition

12   among rental car companies; (2) protecting the airport by preventing consumers from perceiving

13   the airport fees as "an additional tax on airport customers," and (3) preventing customer deception

14   about the total cost of renting a car.  Doc. #64, p. 15 (citing *Sobel III*, 291 F.R.D. at 536-37; *Sobel*

15   *I*, 2007 WL 2710725, at *3-4).  Defendants, however, utterly fail to explain how a monetary award

16   of restitution would "vindicate none of these policies."  Moreover, the Court has already dismissed

17   Defendants' argument that restitution would not serve the statutory purpose of preventing customer

18   deception simply because Plaintiffs were aware of the ACRF in advance of their rentals.

19        Finally, Defendants assert that Plaintiffs' demand for a money judgment does not seek

20   "equitable relief" under Nevada law, but rather seeks restitution at law.  Defendants further assert

21   that the statutory phrase "appropriate equitable relief" distinguishes between remedies at law and

22   genuine equitable remedies, which do not include a personal money judgment against a defendant.

23   While there can be no genuine dispute as to the distinction between remedies at law and remedies

24   in equity, the Court is unpersuaded that the remedy Plaintiffs seek is restitution at law as opposed

25   to equitable restitution.  *Great-West Life & Annuity Insurance Company v. Knudson*, to which

26   Defendants refer, is entirely inapposite on this point.  There, the plaintiffs were seeking damages

for the defendant's unfulfilled past contractual obligation to pay money.  534 U.S. 204, 210 (2002).

The Supreme Court rejected the plaintiffs' attempts to characterize the relief sought as "equitable"

restitution, finding instead that money damages seeking compensation for a loss resulting from the

defendant's breach of legal duty was essentially an action for breach of contract and, thus,

"quintessentially an action at law."  *Id.* at 210-14 (internal citations and quotation marks omitted).

Similarly, in *Ahlers v. Ryland Homes Nevada, LLC*, to which Defendants also cite, the plaintiffs'

claims relied on a contract as the basis for relief.  No. 52511, 2010 Nev. Unpub. LEXIS 209, at *4-

5 (April 16, 2010).  In contrast, here, Plaintiffs' claims do not arise out of a contract, nor do

Plaintiffs seek to enforce any rights thereunder.  Rather, they are asserting title to and the right to

possess particular property, the ACRFs, which were wrongly obtained by Defendants.  As such,

Plaintiffs claim for restitution is properly characterized as a claim for equitable relief.  Neither

*Knudson* nor *Ahlers* involved claims for restitution to remedy "wrongdoing" or "ill-gotten gains,"

and are thus distinguishable on this basis as well.  *See e.g., Trs. of the Nw. Laborers-Emp'rs.*

*Health and Sec. Trust v. Malone*, No. 09-05399, 2010 U.S. Dist. LEXIS 125442, at *8-9 (W.D.

Wash. Nov. 29, 2010) (distinguishing *Knudson* and finding that restitution is equitable where it is

sought for purposes of remedying "wrongdoing"); *Med. Benefits Admin's of MD, Inc. v. Sierra*

*Railroad Co.*, No. S-06-2408, 2007 U.S. Dist. LEXIS 74595, at *16-17 (E.D. Cal. Oct. 5, 2007)

(distinguishing *Knudson* because it involved no allegation of wrongdoing or "ill-gotten gains");

*Sierra Railroad*, 2007 U.S. Dist. LEXIS 74595, at *17 ("claims for [equitable] restitution relating

to 'ill-gotten gains' of a defendant are permissible when a plaintiff alleges fraud or wrongdoing").[22]

///

---

[22]  Defendants argument that a defendant does not engage in "fraud or wrongdoing" when the defendant has a good faith dispute over the existence of the legal obligation that supposedly gives rise to the "wrongdoing" has no merit.  The case to which Defendants cite concerned a good faith dispute over the parties legal obligations arising out of a contract and, thus, has no applicability to the present dispute.  *See Trustees ex rel. Teamsters Benefit Trust v. Doctors Med. Ctr. Of Modesto, Inc.*, 286 F. Supp. 2d 1234 (N.D. Cal. 2003).

1    Defendants' related contention that plaintiffs cannot show that there are particular "funds or

2  property" in Defendants' possession to which they are entitled because none of the ACRF money

3  remains in Defendants' possession is similarly without merit.  Defendants evidently believe that if

4  they characterize the ACRF as merely a "pass through" fee, intended to compensate for their

5  contractual obligation to pay the airport concession fees, the transaction would not involve any

6  "wrongdoing" or "ill-gotten gains."  The Court has already rejected Defendants' position in this

7  regard—the ACRFs are separate and distinct from the airport concession fees.  Moreover,

8  Defendants fail to cite any Nevada case law requiring equitable tracing.  *See IM Partners v. Debit*

9  *Direct Ltd.*, 394 F. Supp. 2d 503, 520 (D. Conn. 2005) (refusing to apply the equitable tracing

10  requirement found in *Knudson* because it is not required under Connecticut law).  While

11  Defendants may have already spent the wrongfully obtained ACRFs, Plaintiffs are nevertheless

12  entitled to equitable restitution of the same.

13    Lastly, the Court rejects Defendants' assertion that monetary relief is barred by the

14  "voluntary payment doctrine."  In *Sobel*, the Court determined, as a matter of law, that Hertz could

15  not rely on the voluntary payment doctrine as a defense to the plaintiffs' claims.  *Sobel II*, 698 F.

16  Supp. 2d at 1224.  The Court maintains that to allow Hertz to avoid liability for an unfair pricing

17  practice via the voluntary payment doctrine would nullify the consumer protection purpose of the

18  statute and be contrary to the intent of the Nevada legislature, which explicitly set forth a civil

19  remedy for precisely this type of violation.  Accordingly, as in *Sobel*, Defendants may not rely on

20  the voluntary payment doctrine as a defense to Plaintiffs' claims.

21    **C.    Plaintiffs' Motion for Summary Judgment**

22    Plaintiffs seek summary judgment for liability and equitable relief on their claim for

23  violation of NRS 482.31575 and summary judgment on their claim for unjust enrichment.  Above,

24  the Court addressed all of the issues asserted in Plaintiffs' Motion for Summary Judgment and

25  contested in subsequent briefing.  As to Plaintiffs' first cause of action for violation of NRS

26  482.31575, the Court has concluded as a matter of law that the statute required rental car

30

companies to include the ACRF in the base rate that the companies advertised, quoted, and charged to individual lessees during the period relevant to this case.  Because there are no disputed issues of material fact concerning Defendants' non-compliance with this requirement, the Court shall grant Plaintiffs' Motion for Summary Judgment as to liability on their claim for violation of NRS 482.31575.  Insofar as Defendants assert a "fair notice" due process defense, the Court finds that it does not preclude summary judgment in Plaintiffs' favor.   Viewing the evidence in the light most favorable to Defendants, the Court finds that Defendants have failed to carry their burden of establishing that NRS 482.31575 was unconstitutionally vague.

Insofar as Plaintiffs are entitled to recover "damages and appropriate equitable relief" for Defendants' violation of NRS 482.31575, the Court finds that summary judgment is appropriate as to Plaintiffs' claim for equitable restitution of the unlawfully collected ACRFs.[23]  Because there are no disputed issues of fact concerning Defendants' unlawful collection and retention of the ACRFs, Plaintiffs are entitled to restitution of the unlawfully collected ACRFs.[24]  Accordingly, summary judgment on Plaintiffs' claim for "appropriate equitable relief" in the form of restitution is granted.[25]

---

[23]  Plaintiffs do not seek summary judgment on the issue of damages for Defendants' violation of NRS 482.31575.  Nevertheless, because Plaintiffs failed to proffer any admissible evidence that Plaintiffs suffered any actual damages by virtue of the manner in which Defendants charged the ACRFs, the Court finds that summary judgment in favor of Defendants on Plaintiffs' claim for damages is appropriate.

[24]  Plaintiffs are also entitled to prejudgment interest from the date the Complaint was served to the time at which the judgment is satisfied, at the rate specified by law.  *See Sobel III*, 291 F.R.D. at 544 (granting prejudgment interest under NRS 17.130(2), which provides that "the judgment draws interest from the time of service of the summons and complaint until satisfied").  Moreover, Plaintiffs concede that they are not entitled to recover any portion of the ACRF attributable to gross revenue from goods and services other than leasing passenger cars.  *See* Doc. #101, p. 14.

[25]  To the extent Defendants contend that Plaintiffs are not entitled to summary judgment as against National Rental Car ("National"), the Court disagrees.  Vanguard operates as both Alamo and National, and maintains a uniform practice of charging all of their customers an unbundled ACRF in violation of NRS 482.31575.  *See* Doc. #97 (Stock Decl.), ¶3, Ex. 3.  Vanguard is the named Defendant

1  As to Plaintiffs' second cause of action for unjust enrichment, the Court shall grant

2  Plaintiffs' Motion for Summary Judgment.  Because Defendants were without legal authority to

3  collect the unbundled ACRF from Plaintiffs, Defendants benefitted from an unjustified windfall.

4  Allowing Defendants to retain the unlawfully collected ACRFs would encourage noncompliance

5  with NRS 482.31575 and grant a windfall to Defendants simply because they charged the ACRF in

6  an unauthorized manner.  Accordingly, the Court finds Defendants liable for unjust enrichment.

7  Nevertheless, the Court finds that a monetary remedy is inappropriate.  As the Court determined in

8  *Sobel*, "a plaintiff may not recover [ ] twice for the same injury simply because he or she has two

9  legal theories."  *Sobel III*, 291 F.R.D. at 541 (citing *Elyousef v. O'Reilly & Ferrario, LLC*, 126

10 Nev. Adv. Op. 43, 245 P.3d 547, 549 (2010)) (internal quotation marks omitted).  Because the

11 Court has determined that restitution under the remedial statute is appropriate, Plaintiffs' request

12 for restitution on their unjust enrichment claim is denied.

13  IT IS THEREFORE ORDERED that Defendants' Motion for Summary Judgment on

14 Liability (Doc. #63) is DENIED.

15  IT IS FURTHER ORDERED that Defendants' Motion for Summary Judgment on Damages

16 and Restitution (Doc. #64) is GRANTED in part and DENIED in part in accordance with this

17 Order.

18  IT IS FURTHER ORDERED that Plaintiffs' Motion for Summary Judgment (Doc. #73) is

19 GRANTED.

20  IT IS SO ORDERED.

21  DATED this 23rd day of June, 2014.

23  LARRY R. HICKS
UNITED STATES DISTRICT JUDGE

25 ─────────────

26 in this action and Defendants do not contend that National is a distinct legal entity.  Accordingly,
Plaintiffs are entitled to summary judgment against Vanguard (i.e., Alamo and National).